# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 28, 2023

Lyle W. Cayce
Clerk

———————

No. 21-20671

———————

J.W.; Lori Washington, *as next friend* J.W.,

*Plaintiffs—Appellants*,

*versus*

Elvin Paley; Katy Independent School District,

*Defendants—Appellees*.

———————————————————

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:18-CV-1848

———————————————————

Before Graves, Willett, and Engelhardt, *Circuit Judges*.
Don R. Willett, *Circuit Judge*:

A school resource officer tased a special-needs student who physically struggled with school staff while attempting to leave school following a violent episode. The student's mother sued the officer and the school district, bringing constitutional claims under 42 U.S.C. § 1983 and disability discrimination claims under the Americans with Disabilities Act and the Rehabilitation Act. We conclude, based on recent Supreme Court precedent, that the district court incorrectly subjected the disability discrimination claims to administrative exhaustion. On the merits, however, the district court correctly granted summary judgment to the officer and school district.

No. 21-20671

Plaintiffs have not shown that the officer intentionally discriminated based on the student's disability. The district court also correctly denied Plaintiffs' claim alleging that the tasing amounted to excessive corporal punishment in violation of the substantive due process clause of the Fourteenth Amendment. We AFFIRM.

I

A

The underlying facts are disturbing. In November 2016, Jevon Washington[1] was a 17-year-old special-needs student at Mayde Creek High School in the Katy Independent School District (KISD) in Katy, Texas. He was diagnosed with "an intellectual disability" and "an emotional disturbance" that impact "his daily functioning, his ability to communicate, control his emotions, and access regular educational services without accommodations." At the time, Jevon was around 6'2" and weighed 250 pounds.

On the day of the incident, Jevon and a fellow special-needs student finished their class assignment and proceeded to play a card game. After some verbal taunting from the student, Jevon became angry, and according to a faculty member, punched the student in the chest before storming out of the classroom.

Jevon tried to enter what he called his "chill out" room—a designated classroom that the school permitted him to use, under his academic accommodations, when he needed to regulate his emotions. Finding the room occupied by another student, Jevon became even more frustrated. A

_____

[1] Because this case involves events that occurred when Jevon was a minor, the case caption and initial district court filings referred to him by his initials to protect his identity. Now that his name has been disclosed, we refer to him by his full name.

staff member witnessed Jevon throw a desk across the room before kicking the door and heading toward the school exit. He was stopped in the breezeway by a security guard, a school resource officer, an athletic coach, and the assistant principal.

Soon after, the individual Defendant, school resource officer Elvin Paley, heard a request for assistance over the school radio and arrived on the scene. Officer Paley had never interacted with Jevon before but said in his declaration that he "knew [Jevon] was probably a special needs student . . . but [he] did not know anything about [Jevon's] specific disability or limitations." Officer Paley did not witness the earlier incident in which Jevon punched his classmate but said that he had previously "witnessed [Jevon] leave class, curse at teachers, and punch the concrete hallway walls."

Officer Paley's body camera captured most of the subsequent events in the breezeway. Officer Paley watched from a short distance away as Jevon paced in front of the exit door, explaining to staff that he wanted to walk home so he could calm down. The video shows Security Guard John Oglesby standing in front of the door, attempting to orally de-escalate the situation by asking what happened and suggesting that Jevon go to his designated classroom to calm down. Jevon only became more agitated, responding to Guard Oglesby with profanities. When Jevon pushed against the exit door, a struggle ensued at the door with Guard Oglesby attempting to hold the door shut to keep Jevon inside.

Officer Paley moved toward Jevon and Guard Oglesby, with the body camera footage going dark as he pushed up against Jevon's body. Both Officer Paley and Guard Oglesby told Jevon to calm down several times. Officer Paley threatened to tase Jevon, and a voice is heard saying, "You are not going to get through this door, just relax." Jevon then began screaming that he wanted to go home.

No. 21-20671

As Officer Paley moved away from Jevon, the video becomes clear again, showing Guard Oglesby and a female school resource officer struggling to hold Jevon in the doorframe as he tried to slip through. Officer Paley told the staff members to "let him go," and as Jevon walked outside, Officer Paley fired his taser. Jevon screamed and fell to his knees. With Jevon on his knees, Officer Paley continued to tase Jevon, using a "drive stunning" method.[2] Officer Paley used the taser for approximately 15 seconds total, continuing to tase Jevon in the back even after he was lying facedown on the ground and not struggling.

As a result of the tasing, Jevon urinated, defecated, and vomited on himself. Officer Paley commanded Jevon to put his hands behind his back while the female officer handcuffed him. School officials called the school nurse and subsequently the paramedics to treat Jevon. They then contacted Jevon's mother, Lori Washington.

Quite understandably, the family struggled in the aftermath, with Ms. Washington keeping Jevon home from school for several months because she feared for his safety at school and because the tasing caused him intense anxiety and PTSD.

B

After an unfruitful meeting between Ms. Washington and the school district, Ms. Washington filed a petition against the school district with the Texas Education Agency under the procedures provided in the Individuals with Disabilities Education Act (IDEA). In addition to the IDEA claims, the petition included constitutional claims under 42 U.S.C. § 1983 along with

---

[2] To "drive stun" means to hold the taser against the body without deploying the prongs.

claims under Title II of the Americans with Disabilities Act (ADA) and § 504 of the Rehabilitation Act (§ 504).

KISD responded by arguing, in part, that the hearing officer did not have jurisdiction over the non-IDEA claims. The hearing officer agreed and dismissed all non-IDEA claims for lack of jurisdiction. Likewise, the hearing officer dismissed the IDEA claims on timeliness grounds.

Ms. Washington, on behalf of Jevon (collectively "Plaintiffs"), sued KISD and Officer Paley (collectively "Defendants") in federal district court, again asserting claims under the ADA and § 504 against KISD, as well as § 1983 claims under the Fourth and Fourteenth Amendments against Officer Paley.[3] Plaintiffs sought compensatory and punitive damages along with attorney fees.

Defendants jointly moved for summary judgment. The district court denied summary judgment on the § 1983 Fourth Amendment excessive force claim against Officer Paley but granted summary judgment to Defendants on all other claims. The district court held that: (1) Plaintiffs' ADA and § 504 claims were precluded for failure to exhaust administrative procedures; (2) alternatively, Plaintiffs' ADA and § 504 claims failed on the merits; (3) Plaintiffs' § 1983 Fourteenth Amendment substantive due process claim was precluded under our precedent in *Fee v. Herndon*;[4] and (4) Officer Paley was not entitled to qualified immunity on the § 1983 Fourth Amendment excessive force claim because of genuine and material factual disputes. The

---

[3] Plaintiffs originally asserted § 1983 claims against KISD but later abandoned them. They also asserted a claim under the Texas Constitution against Officer Paley, but the district court granted summary judgment on that claim, and it is not at issue in this appeal.

[4] 900 F.2d 804 (5th Cir. 1990), *cert. denied*, 498 U.S. 908 (1990).

district court rejected Plaintiffs' motion for reconsideration as to their ADA and § 504 claims.

Defendants challenged the district court's denial of qualified immunity on the Fourth Amendment excessive force claim in an interlocutory appeal to this court, and we reversed in an unpublished opinion.[5] Plaintiffs' requests for a panel rehearing and rehearing en banc were denied.[6]

Plaintiffs timely appealed the district court's grant of summary judgment to Defendants on the disability discrimination claims and the § 1983 Fourteenth Amendment substantive due process claim. Specifically, Plaintiffs argue on appeal that the district court erred by: (1) subjecting their disability discrimination claims under the ADA and § 504 to the IDEA exhaustion requirement; (2) concluding that their disability discrimination claims were not viable on the merits; and (3) barring Plaintiffs' substantive due process claim based on a misreading of our precedent in *Fee*.

II

"We review a grant of summary judgment de novo, viewing all evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor."[7] Summary judgment is appropriate only when the moving party establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[8]

---

[5] *J.W. v. Paley*, 860 F. App'x 926 (5th Cir. 2021) (per curiam).

[6] Order, *J.W. v. Paley*, No. 19-20429 (5th Cir. Nov. 18, 2021).

[7] *Pierce v. Dep't of the Air Force*, 512 F.3d 184, 186 (5th Cir. 2007) (italics omitted).

[8] Fed. R. Civ. P. 56(a).

No. 21-20671

## III

In its summary judgment ruling and subsequent denial of Plaintiffs' motion for reconsideration, the district court held that Plaintiffs were required to exhaust administrative procedures under the IDEA before bringing their ADA and § 504 claims in district court. Plaintiffs contend that their ADA and § 504 claims are not subject to the IDEA's exhaustion provision.[9] With the helpful guidance of recent Supreme Court precedent, we agree with Plaintiffs.

The IDEA aims to ensure that children with disabilities receive special education services.[10] It does so by offering federal funds to states in exchange for a commitment to furnish a "free appropriate public education" to children with certain disabilities.[11] It also provides procedural safeguards that parents can use when they disagree with the school regarding their child's education.[12] Specifically, a parent may file a complaint with a state or local agency,[13] and after an initial mandatory meeting,[14] may proceed to a "due process hearing" before an impartial hearing officer,[15] followed by an appeal to the state education agency (if the initial complaint was filed

_____

[9] Plaintiffs also argue: (1) that Defendants should be judicially estopped from relying on the IDEA exhaustion requirement because they previously made contradictory arguments in the IDEA due process hearing; and (2) that exhaustion would be futile. Due to the Supreme Court's clear guidance on IDEA exhaustion, we decline to address these arguments.

[10] *Fry v. Napoleon Cmty. Schs.*, 580 U.S. 154, 158 (2017).

[11] *Id.*; 20 U.S.C. § 1412(a)(1).

[12] *Fry*, 580 U.S. at 159.

[13] *See* 20 U.S.C. § 1415(b)(6).

[14] *Id.* § 1415(f)(1)(B)(i).

[15] *Id.* § 1415(f)(1)(A).

No. 21-20671

locally).[16] Only after exhausting that process can a parent seek judicial review by filing a civil action in state or federal court.[17]

Importantly for our purposes, the IDEA contains an exhaustion requirement for certain claims brought under laws that may overlap with the IDEA, including the ADA and Rehabilitation Act:

> Nothing in [the IDEA] shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the [ADA], title V of the Rehabilitation Act [including § 504], or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under [the IDEA], the [IDEA's administrative procedures] shall be exhausted to the same extent as would be required had the action been brought under [the IDEA].[18]

At the time this appeal was filed, our precedent applied this exhaustion requirement even to suits seeking remedies not provided by the IDEA, such as compensatory damages.[19] But prior to oral argument, the Supreme Court granted certiorari in *Perez v. Sturgis Public Schools*,[20] and we granted Plaintiffs' motion to place this appeal in abeyance, acknowledging the potential impact of *Perez* on the application of IDEA exhaustion.[21]

---

[16] *See id.* § 1415(g).

[17] *See id.* § 1415(i)(2)(A).

[18] *Fry*, 580 U.S. at 161 (alteration in original) (quoting 20 U.S.C. § 1415(l)).

[19] *McMillen v. New Caney Indep. Sch. Dist.*, 939 F.3d 640, 648 (5th Cir. 2019) ("[B]ecause the IDEA can remedy the failure to provide a blind student with a reader by giving her one, a suit seeking damages for such a failure must first exhaust the IDEA's administrative procedures.").

[20] 143 S. Ct. 81 (Mem) (granting certiorari).

[21] Order, *J.W. v. Paley*, No. 21-20671 (5th Cir. Oct. 3, 2022). In their motion to reconsider abatement, Defendants argue that Plaintiffs have forfeited any argument that

No. 21-20671

The Supreme Court's recent decision in *Perez* provides unmistakable new guidance.[22] Interpreting the word "relief" in the IDEA's exhaustion provision as synonymous with "remedies," the Court held that because the IDEA's exhaustion requirement applies only to suits that "seek[] relief . . . also available under" the IDEA,[23] it does not apply "when a plaintiff seeks a remedy IDEA cannot provide."[24] As the plaintiff in *Perez* sought compensatory damages, a remedy both sides agreed was unavailable under the IDEA, his claim was not subject to the IDEA's exhaustion requirement.[25]

Similarly here, Plaintiffs seek compensatory and punitive damages.[26] The IDEA provides neither. Thus, Plaintiffs can proceed without exhaustion.

---

suits for remedies not available under the IDEA are exempt from the IDEA exhaustion requirement because Plaintiffs only raised the issue in a "passing footnote." Indeed, in their opening brief, Plaintiffs acknowledge in a footnote that the argument is foreclosed by our decision in *McMillen*, but "reserve the right to challenge that holding en banc or in a petition for certiorari to the Supreme Court." We hold that this was sufficient to preserve the argument in the event of intervening Supreme Court precedent. *See United States v. Pineiro*, 377 F.3d 464, 467 (5th Cir. 2004) (holding that an argument was preserved for review in light of intervening Supreme Court precedent when appellant conceded the argument was foreclosed by circuit precedent but raised it in his brief only to "preserve it for further review"), *cert. granted, vacated on other grounds*, *Pineiro v. United States*, 543 U.S. 1101 (2005).

[22] *Perez v. Sturgis Pub. Schs.*, 598 U.S. 142 (2023).

[23] *Id.* at 863.

[24] *Id.* at 865.

[25] *Id.* at 863–64.

[26] Plaintiffs also seek attorney fees. Attorney fees *are* an available remedy under the IDEA, *see* 20 U.S.C. § 1415(i)(3)(B), and *Perez* indicates that requests for remedies provided by the IDEA may be subject to exhaustion even if included in an action that also requests damages. *Perez*, 598 U.S. at 150 ("[A] plaintiff who files an ADA action seeking both damages and the sort of equitable relief IDEA provides may find his request for

Plaintiffs also contend that the district court erred in holding that their ADA and § 504 claims against KISD fail on the merits. We disagree. The district court properly granted summary judgment to KISD on the merits of the ADA and § 504 claims because Plaintiffs failed to produce evidence of *intentional* discrimination.

A

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."[27] Section 504 of the Rehabilitation Act of 1973 provides, in relevant part:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.[28]

"The language in the ADA generally tracks the language set forth in [§ 504]."[29] And the ADA expressly provides that "[t]he remedies, procedures, and rights" available under the Rehabilitation Act are also

---

equitable relief barred or deferred if he has yet to exhaust [IDEA procedures]."). However, it would be nonsensical to apply the exhaustion requirement solely to the attorney fees request because Plaintiffs' request for attorney fees is inextricably intertwined with the ADA and § 504 claims for compensatory and punitive damages they bring.

[27] 42 U.S.C. § 12132.

[28] 29 U.S.C. § 794.

[29] *Delano-Pyle v. Victoria Cnty.*, 302 F.3d 567, 574 (5th Cir. 2002).

accessible under the ADA.[30] Thus, we "equate[] liability standards under § 504 [of the Rehabilitation Act] and the ADA."[31]

To establish a prima facie case under either statute, a plaintiff must show:

> (1) that he is a qualified individual . . . ; (2) that he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability.[32]

"The only material difference between [§ 504 and Title II of the ADA] lies in their respective causation requirements."[33] Section 504 requires that the plaintiff's disability be the "sole reason" for the exclusion or denial of benefits, but the ADA's standard is less stringent.[34]

The ADA and § 504 provide for vicarious liability. This means that a plaintiff need not identify an official policy to sustain a claim against a public entity as it may be held vicariously liable for the acts of its employees under either statute.[35]

Plaintiffs can only recover damages under the ADA or § 504 upon a showing of intentional discrimination.[36] While we have not "delineate[d] the

---

[30] 42 U.S.C. § 12133.

[31] *D.A. ex rel. Latasha A. v. Hous. Indep. Sch. Dist.*, 629 F.3d 450, 453 (5th Cir. 2010).

[32] *T.O. v. Fort Bend Indep. Sch. Dist.*, 2 F.4th 407, 417 (5th Cir. 2021) (alteration in original) (quoting *Melton v. Dallas Area Rapid Transit*, 391 F.3d 669, 671–72 (5th Cir. 2004)).

[33] *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005).

[34] *Id.* (quoting *Soledad v. U.S. Dep't of Treasury*, 304 F.3d 500, 503 (5th Cir. 2002)).

[35] *See Delano-Pyle*, 302 F.3d at 574–75.

[36] *Id.* at 574.

precise contours" of this intentionality requirement, our "cases to have touched on the issue require something more than deliberate indifference."[37] "Of course, this standard is met under circumstances revealing a discriminatory motive."[38]

Because disparate treatment and failure-to-accommodate claims under the ADA and § 504 are distinct,[39] the intentionality standard looks different for each of them. Our case law provides more guidance for failure-to-accommodate claims than disparate treatment claims. For a failure-to-accommodate claim specifically, "intentional discrimination requires at least actual knowledge that an accommodation is necessary."[40] The requisite notice comes from the plaintiff's request for an accommodation or from facts establishing that "'the disability, resulting limitation, and necessary reasonable accommodation' were 'open, obvious, and apparent' to the entity's relevant agents."[41] Notice beyond merely notice of the disability is required because "[t]he ADA [and § 504] do[] not require clairvoyance."[42] "[K]nowledge of a disability is different from knowledge of the resulting limitation" and "certainly is different from knowledge of the necessary accommodation."[43] When a disability is mental, rather than physical, the

_____

[37] *Cadena v. El Paso Cnty.*, 946 F.3d 717, 724 (5th Cir. 2020) (internal quotations omitted) (quoting *Miraglia v. Bd. of Supervisors of La. State Museum*, 901 F.3d 565, 575 (5th Cir. 2018)).

[38] *Wilson v. City of Southlake*, No. 21-10771, 2022 WL 17604575, at *6 (5th Cir. Dec. 13, 2022) (per curiam).

[39] *Windhauser v. Bd. of Supervisors for La. State Univ. & Agric. & Mech. Coll.*, 360 F. App'x 562, 565 (5th Cir. 2010) (per curiam).

[40] *Smith v. Harris Cnty.*, 956 F.3d 311, 319 (5th Cir. 2020).

[41] *Windham v. Harris Cnty.*, 875 F.3d 229, 237 (5th Cir. 2017) (citation omitted).

[42] *Id.* at 236 (quoting *Hedberg v. Ind. Bell Tel. Co.*, 47 F.3d 928, 934 (7th Cir. 1995)).

[43] *Id.* at 238.

No. 21-20671

disability, resulting limitations, and necessary reasonable accommodations often are not "open, obvious, and apparent."[44]

B

It is this "intentional discrimination" requirement that dooms Plaintiffs' claims under either a disparate treatment or failure-to-accommodate theory. While Officer Paley may have used poor judgment when he tased Jevon, Plaintiffs have failed to create a genuine dispute on the issue of whether Officer Paley *intentionally discriminated* against Jevon by reason of his disability.

On appeal, Plaintiffs frame their ADA and § 504 claims as disparate treatment claims. They point to Officer Paley's declaration, in which he stated that he wanted to keep Jevon inside the school because Jevon's disability made leaving the premises unsafe. According to Plaintiffs' logic, because Jevon's disability motivated Officer Paley to keep him inside the school and because he tased Jevon to keep him inside, a jury could reasonably conclude Officer Paley discriminated against Jevon *by reason of* his disability.

But more is required to meet the intentional discrimination standard. Officer Paley's desire to keep Jevon inside the school does not rise to the level of "something more than deliberate indifference" to Jevon's disability.[45] In fact, record evidence shows that Officer Paley's desire to keep Jevon inside the school arose from *consideration* of the vulnerabilities surrounding Jevon's disability, not from indifference, much less ill-will or discriminatory animus. As the district court put it, "The treatment of a disabled student may be

---

[44] *Taylor v. Principal Fin. Grp.*, 93 F.3d 155, 165 (5th Cir. 1996).

[45] Plaintiffs argue that "the district court held Plaintiffs to an unduly high standard for proving discriminatory intent, faulting Plaintiffs for failing to show that Defendants' treatment of Jevon was 'motivated by ill will, prejudice, or spite.'" But this is something of a red herring as Defendants' actions do not even rise to the level of "deliberate indifference."

different from that of a nondisabled student, but different is not necessarily discriminatory." If different were always discriminatory, then even disability *accommodations* would be discriminatory.

Against this logic, Plaintiffs argue that we must consider the *method* that Officer Paley used to keep Jevon from exiting the building: tasing him repeatedly. Again, the tasing was arguably excessive. However, based on the summary judgment evidence, it was not indifference or hostility toward Jevon's disability that motivated Officer Paley when he tased Jevon, but a desire to keep Jevon safe inside the school because of the vulnerabilities caused by his disability. To show why this subtle distinction matters, consider a hypothetical non-disabled student behaving similarly to Jevon who was similarly considered, for whatever reason, unsafe to leave the school. Plaintiffs have failed to produce evidence that Officer Paley would not have tased such a *non-disabled* student.[46]

---

[46] Plaintiffs claim that, based on the evidence they produced, a finder of fact could conclude that a non-disabled student would have been treated differently than Jevon. Putting aside the fact that this argument does not speak to the *intentional* discrimination requirement, Plaintiffs' argument is a stretch. Plaintiffs' summary judgment evidence includes the school district disciplinary handbook, which provides that "[s]tudents who leave campus at any time without parental permission and administrative approval shall be considered truant and will be subject to disciplinary action." Plaintiffs contend that because nothing in the handbook allows a school official to restrain a student to prevent truancy, "a finder of fact could conclude that the truancy policies that would ordinarily apply to a nondisabled student attempting to leave campus were not applied to Jevon and that he was instead subjected to a particularly violent form of restraint because he was disabled." But the *lack* of a specific policy allowing school officials to restrain students attempting to leave school does not lead to a reasonable inference that a non-disabled student attempting to leave campus would have been treated differently than Jevon. The policy disallows students from leaving campus and simply does not specify methods by which officials can stop students from leaving. This makes sense as different situations may call for different actions from school officials. Thus, there is no evidence that a non-disabled person would not have been tased in similar circumstances. And in fact, the record shows that Officer Paley was involved in another incident in which he tased a non-disabled student in February 2017. Although the student was not attempting to leave the school, the incident was similar in

Plaintiffs further argue that Officer Paley's statements in the aftermath of the tasing show discriminatory intent. Immediately after the tasing, Officer Paley said to Jevon as he lay on the ground: "I did not want to tase you, but you do not run shit around here, you understand?" Officer Paley subsequently explained, "I got tired of wrestling with him so I popped him." While these statements may have been inappropriate, they do not show indifference or discriminatory animus toward Jevon's *disability*. Indeed, Officer Paley's chosen language made no reference to Jevon's disability and was not traditionally associated with a protected disability. Plaintiffs have thus failed to create a material dispute on the issue of intentional discrimination in regard to their disparate treatment claim.

And to the extent Plaintiffs put forth a failure-to-accommodate claim, it similarly fails. While Officer Paley said in his declaration that he had prior knowledge of Jevon's disability, there is no evidence that he had notice of its *resulting limitations* or *necessary accommodations*. Plaintiffs do not contend that Officer Paley had been privy to the meetings regarding limitations of and/or accommodations for Jevon's disability. Nor were the limitations or accommodations "open, obvious, and apparent" to Officer Paley. In fact, he had already witnessed the failure of staff's attempts to orally de-escalate the situation. There is no evidence that Officer Paley was aware or should have been aware of a further accommodation that would have calmed Jevon down. Plaintiffs have thus failed to create a material dispute on the issue of intentional discrimination for their failure-to-accommodate claim.

We reiterate that Officer Paley's use of his taser in this situation was poor judgment, especially after Jevon had ceased struggling. However, § 504 of the Rehabilitation Act and Title II of the ADA are not the proper vehicles

---

that Officer Paley deployed his taser to restrain and gain control over a student behaving disruptively.

No. 21-20671

for remedying "*all* unreasonable, inappropriate, unprofessional, and/or unduly harsh conduct by public agents."[47]

We AFFIRM the district court's grant of summary judgment to KISD on the ADA and § 504 claims.

IV

Finally, Plaintiffs argue that the district court misapplied our precedent when it granted summary judgment to Officer Paley on the substantive due process claim.[48]

In its opinion, the district court acknowledged that "[s]chool children have a liberty interest in their bodily integrity protected by the Due Process Clause of the Fourteenth Amendment, and . . . physical abuse by a school employee violates that right." But in granting summary judgment to Officer Paley, it applied our holding in *Fee v. Herndon*, that "as long as the state provides an adequate remedy, a public school student cannot state a claim for denial of substantive due process through excessive corporal punishment."[49]

---

[47] *Wilson*, 2022 WL 17604575, at *11.

[48] Defendants contend that this argument is precluded by our previous opinion in *J.W. v. Paley*, 860 F. App'x 926 (5th Cir. 2021) (per curiam), under law-of-the-case doctrine. Under that doctrine, "when a court decides upon a rule of law, that decision should continue to govern the same issue in subsequent stages in the same case." *Lindquist v. City of Pasadena*, 669 F.3d 225, 238 (5th Cir. 2012) (citation omitted). While our previous decision discussed *Fee*, it did not "decide" the substantive due process issue. *See J.W.*, 860 F. App'x at 928–29. It only decided the Fourth Amendment excessive force qualified immunity issue. Thus, law-of-the-case does not apply. *See Pegues v. Morehouse Par. Sch. Bd.*, 706 F.2d 735, 738 (5th Cir. 1983).

[49] *Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000) (citing *Fee*, 900 F.2d at 808). In *Fee*, we denied the substantive due process claim of a special-needs student's parents who alleged that their child was beaten so excessively for misbehaving that he was forced to remain in psychiatric rehabilitation for months. 900 F.2d at 805–10. We reasoned that when "the forum state affords adequate post-punishment civil or

No. 21-20671

Plaintiffs contend that *Fee* is inapplicable because the tasing incident cannot properly be defined as "corporal punishment." The Supreme Court has defined "corporal punishment" as the use of "reasonable but not excessive force to discipline a child" that a teacher or administrator "reasonably believes to be necessary for the (the child's) proper control, training, or education."[50] We've explained: "At bottom, fairly characterizing an act as corporal punishment depends on whether the school official intended to discipline the student for the purpose of maintaining order and respect or to cause harm to the student for no legitimate pedagogical purpose."[51]

We have dismissed substantive due process claims under *Fee* "when the offending conduct occurred in a disciplinary, pedagogical setting."[52] "In contrast, we have allowed substantive due process claims against public school officials to proceed when the act complained of was 'arbitrary,

---

criminal remedies" for corporal punishment, "such states have provided all the process constitutionally due." *Id*. at 808.

[50] *Ingraham v. Wright*, 430 U.S. 651, 661 (1977).

[51] *Flores v. School Bd. DeSoto Par.*, 116 F. App'x 504, 510–11 (5th Cir. 2004).

[52] *T.O. v. Fort Bend Indep. Sch. Dist.*, 2 F.4th 407, 414 (5th Cir. 2021) ("For example, we dismissed substantive due process claims (1) when a student was instructed to perform excessive physical exercise as a punishment for talking to a friend; (2) when a police officer slammed a student to the ground and dragged him along the floor after the student disrupted class; (3) when a teacher threatened a student, threw him against a wall, and choked him after the student questioned the teacher's directive; (4) when an aide grabbed, shoved, and kicked a disabled student for sliding a compact disc across a table; and (5) when a principal hit a student with a wooden paddle for skipping class." (citations omitted)).

capricious, or wholly unrelated to the legitimate state goal of maintaining an atmosphere conducive to learning.'"[53]

Plaintiffs argue that the tasing incident was not corporal punishment because "Paley was not trying to punish or discipline Jevon for an infraction." Officer Paley, on the other hand, focuses on the word "control" in the Supreme Court's definition of corporal punishment, arguing that he was attempting to assert control over Jevon by restraining him with the taser. Our precedent favors Officer Paley.

We have applied *Fee* in cases where, although the offending conduct may not have been traditional "punishment," it was intended to assert order or control over a student for a legitimate pedagogical purpose. For instance, in *T.O. v. Fort Bend Independent School District*, a student was removed from his classroom due to disruptive behavior.[54] A teacher who was walking by positioned herself between the student and the door so he could not return to the classroom.[55] When the student tried to push the teacher so he could get into the classroom, she threw him to the ground and placed him in a chokehold.[56] We applied *Fee*, explaining, "The facts alleged simply do not suggest that T.O. was the subject of a 'random, malicious, and unprovoked attack,' which would justify deviation from *Fee*."[57]

---

[53] *Id.* at 414 ("For example, we held that a substantive due process claim could proceed when a teacher allegedly molested a student, and when a teacher tied a student to a chair for two days as part of an experimental technique." (citations omitted)).

[54] *Id.* at 412.

[55] *Id.*

[56] *Id.*

[57] *Id.* at 415 (citation omitted).

No. 21-20671

Similarly, this case involves disruptive behavior from Jevon and a struggle to keep him from going through a door. And like the teacher in *T.O.*, Officer Paley was not necessarily "punishing" Jevon but trying to restrain him for the pedagogical purpose of maintaining order. Like the incident in *T.O.*, the tasing incident was not a "random, malicious, and unprovoked attack."

*Campbell v. McAlister*, while not published precedent, is also particularly on point.[58] The case concerned a five-year-old boy who was "misbehaving" in class.[59] Feeling they could not "control" the boy, his teacher and the assistant principal summoned the help of a police officer, Officer McAlister, to remove the boy from the classroom and escort him to the principal's office.[60] The boy's family alleged that the officer "slammed [the boy] to the floor" and "dragged [him] along the ground to the principal's office."[61] We applied *Fee*:

> In this case, there is no question that McAlister's use of force to remove Dennis from his classroom w[as] rationally related to legitimate school interests in maintaining order. As the district court noted, and the Campbells apparently concede, Texas provides civil and criminal post-deprivation remedies for the excessive use of force by school officials. Thus, the district court correctly concluded that the Campbells's substantive due process claim fails as a matter of law.[62]

---

[58] No. 90-20675, 1998 WL 770706 (5th Cir. Oct. 20, 1998) (per curiam).

[59] *Id.* at *1.

[60] *Id.*

[61] *Id.*

[62] *Id.* at *5.

No. 21-20671

Like Officer McAlister, Officer Paley is a law enforcement officer. And in both cases, the officers were not engaged in traditional "punishment" of a student, but used force for restraint purposes. In each case this restraint was used for a legitimate pedagogical purpose—either transporting a disruptive student to the principal's office to limit disruption or keeping a disruptive student inside the school due to safety concerns. While the force used in each case may have been excessive, the purpose of such force was "rationally related to legitimate school interests in maintaining order."[63]

The cases that Plaintiffs cite are inapposite. One involved the sexual molestation of a student by her teacher,[64] and the other involved a teacher tying a student to a chair for two days as part of an experimental teaching technique,[65] acts plainly "unrelated to any legitimate state goal."[66] This case clearly falls on the *T.O.* and *McAlister* side of the spectrum.

Again, under *Fee*, claims for excessive corporal punishment are precluded if the forum state provides adequate post-punishment civil or criminal remedies. Texas provides such remedies.[67]

We AFFIRM the district court's grant of summary judgment to Officer Paley on the Fourteenth Amendment substantive due process claim.

## V

Parents deserve to believe that their children, no matter their unique needs, are safe at school. We are sympathetic to what Ms. Washington and

---

[63] *Id.*

[64] *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 445 (5th Cir. 1994) (en banc).

[65] *Jefferson v. Ysleta Indep. Sch. Dist.*, 817 F.2d 303, 305–06 (5th Cir. 1987).

[66] *T.O.*, 2 F.4th at 414.

[67] *McAlister*, 1998 WL 770706, at *5.

No. 21-20671

Jevon have endured. However, controlling precedent provides no remedy for the claims they bring.

AFFIRMED.

No. 21-20671

James E. Graves, Jr., *Circuit Judge*, dissenting in part:

I agree with the majority that the district court erred in subjecting Jevon Washington's disability discrimination claims to an exhaustion requirement. But I disagree with the majority that Washington's disability discrimination claims are not viable on the merits. Further, because there are genuine disputes of material fact sufficient to defeat summary judgment, I would vacate and remand on the disability discrimination claims. Thus, I respectfully dissent in part.

The district court denied summary judgment as to the excessive force claim, saying that there were genuine disputes of material fact as to whether the tasing was objectively unreasonable and whether qualified immunity applied. But the district granted summary judgment as to Washington's other claims. In doing so, the district court found that Washington had failed to exhaust his disability discrimination claims. Washington moved for reconsideration on the basis that the district court erred by imposing an exhaustion requirement. The district court denied the motion, reasserting its exhaustion finding. The district court also found, in the alternative, that Washington's disability discrimination claims failed on the merits. Specifically, the district court found that, "[t]he record evidence shows no factual dispute material to determining that the defendants did not intentionally discriminate against [Washington] because of his disabilities."

Both the district court and the majority set out the requisite elements for Washington to establish such a disability discrimination claim, and the requirement that he prove the discrimination was intentional, or something more than deliberate indifference, to recover damages. *See T.O. v. Fort Bend Indep. Sch. Dist.*, 2 F.4th 407, 417 (5th Cir. 2021); *see also Delano-Pyle v. Victoria Cty., Tex.*, 302 F.3d 567, 574 (5th Cir. 2002); and *Cadena v. El Paso Cnty.*, 946 F.3d 717, 724 (5th Cir. 2020). Though acknowledging that

No. 21-20671

Washington was treated differently than a non-disabled student would have been, the district court found that the "uncontroverted summary judgment evidence undermines any inference" that Paley's actions were "motivated by ill will, prejudice, or spite" or "by reason of" Washington's disabilities.

The majority now affirms that Washington is unable to establish intentional discrimination, saying that, Paley "may have used poor judgment" in repeatedly tasing Washington, but there is no dispute on whether it was not intentional discrimination by reason of his disability. However, the record here does not support such a conclusion.

Paley's argument is contradictory, as is the majority's resulting analysis. For example, Paley admits knowing that Washington was disabled but then claims he had no knowledge of Washington's specific disability.[1] However, that claim is contradicted by Paley's additional claim that he tased Washington repeatedly because his disability made leaving the premises unsafe. If Paley had no knowledge of Washington's specific disability, then he would not know whether his disability made leaving the premises unsafe or whether repeatedly tasing him would be an appropriate accommodation.

Similarly, the majority says, "based on summary judgment evidence, it was not indifference or hostility towards Jevon's disability that motivated Officer Paley when he tased Jevon, but a desire to keep Jevon safe inside the school because of the vulnerabilities caused by his disability." Again, if Paley had no knowledge of Washington's specific disability, then he had no knowledge of any specific vulnerabilities or accommodations.[2] Further, the

---

[1] Paley's claim is further contradicted by his admission that he knew of multiple specific incidents.

[2] This is further supported by the majority's analysis of Washington's failure-to-accommodate claim, wherein it concludes that "there is no evidence that [Paley] had notice of its *resulting limitations* or *necessary accommodations*." (Emphasis original).

majority fails to cite any authority for its attempt to equate repeatedly tasing a disabled student with a disability accommodation.

The majority also fails to give sufficient weight to Paley's explicit statements as to exactly why he repeatedly tased Washington, conceding only that they "may have been inappropriate." These statements are much more than inappropriate. Instead, they directly contradict Paley's claim that he repeatedly tased Washington to protect him. Paley told Washington, "I did not want to tase you, but you do not run shit around here." Paley then said, "I got tired of wrestling with him so I popped him." Significantly, Paley did not say anything about tasing Washington repeatedly to keep him safe or as an accommodation. Paley's actual statements support Washington's argument that he was tackled and repeatedly tased because of his disability. The record clearly establishes that Washington was attempting to leave because of his disability. The issue is whether Paley tackled and tased him repeatedly because he believed that it was necessary to keep Washington safe, as he says now, or because of indifference, ill will, hostility or discriminatory intent. Paley's statements that "you do not run shit around here" and "I got tired of wrestling with him so I popped him" fall squarely into the latter category.

Moreover, nothing Paley said prior to tasing Washington provides support for Paley's claim that he was only concerned about Washington's safety. As recounted by the majority, Paley threatened to tase Washington, who screamed that he wanted to go home. Paley then moved away and told staff members to "let him go," as if Washington was going to be allowed to leave. Once Washington walked outside, Paley then repeatedly tased him, even after he was lying face down on the ground.

As the majority concedes, we must view the evidence in the light most favorable to Washington and draw all reasonable inferences in his favor. *See*

24

*Kariuki v. Tarango*, 709 F. 3d 495, 501 (5th Cir. 2013).  When we do that, there are clearly genuine disputes of material fact sufficient to overcome summary judgment on the disability discrimination claims.  *See* Fed. R. Civ. P. 56(a).  Because I would vacate and remand on these claims, I respectfully dissent in part.